U.S. COURTS
01 FEB 12 PM 4:36
FAX FILED

Lori A. Terry
Preston Gates & Ellis LLP
701 Fifth Avenue, Suite 5000
Seattle, WA 98104-7078
Telephone: (206) 623-7580
Facsimile: (206) 623-7022

John R. Nelson
Preston Gates & Ellis LLP
601 West Riverside Avenue, Suite 1400
Spokane, WA 99201-0636
Telephone: (509) 624-2100
Facsimile: (509) 456-0146

Attorneys for Defendants Henry Bosma, Grandview Dairy and Bosma Enterprises

C. Tom Arkoosh
Arkoosh Law Offices
301 Main Street
P.O. Box 32
Gooding, ID 83330
Telephone: (208) 934-8872
Facsimile: (208) 934-8873

Local Attorney for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

IDAHO RURAL COUNCIL, an Idaho corporation,,

    Plaintiff,

v.

JACOB BOSMA, Owner and Operator of GrandView Dairy; HENRY BOSMA, Owner and Operator of GrandView Dairy; GRANDVIEW DAIRY, a/k/a Bliss Acres; and, BOSMA ENTERPRISES, INC.,

    Defendants.

No. 99-0581-S-BLW

DECLARATION OF JOHN RAY NELSON ATTACHING EVIDENCE IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

DECLARATION OF TOM ARKOOSH ATTACHING EVIDENCE IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 1

1. Plaintiff IRC is a an Idaho non-profit corporation. Complaint, ¶ 7; Nelson Dec., Ex. 1, James Dep. pp. 13:7-12 (Plaintiff is a 501(c)(3) corporation.) The IRC works to promote "sustainable agriculture," to oppose "corporate concentration in our food system," and to address "factory farm issues." (*Id.*, pp. 19:6-21:20; 26:9-22 (mission statement). As to "factory farm issues," the IRC opposes "large industrial agriculture. (*Id.*, p. 31:2-19). Its "objective is to reduce the impact of large, industrial farms upon the environment and the society that we live in in rural areas." (*Id.*, p. 45:15-23.)

2. The IRC is *not* concerned with opposing water pollution generally – if the water pollution is from a "small" farm, or from one of the IRC's *members*, it is not objectionable to the IRC. (*Id.*, pp. 45:24-50:18; 51:24-52:14; 54:19-56:17.) In fact, the IRC has never prosecuted any other Clean Water Act cases, and has never sent a notice letter under the Clean Water Act other than the one it sent to Defendants (*Id.*, pp. 29:12-31:1.) The IRC decided to sue Defendants when Stacy Butler came to it in September 1999 and told the Board how the Defendants had allegedly polluted the Butler's spring. (*Id.*, pp. 60:14-61:15.)

3. Plaintiff designated the Butlers (members since 9/99) and the Walkers (members since 10/99) as its individual members with standing to bring claims against Defendants under the Clean Water Act. (Complaint, ¶ 9 (identifying the Butlers as IRC members); Nelson Dec., Ex. 8, Plaintiff's Response to Jacob Bosma's and Grandview Dairy's First Set of Interrogatories, etc., Int. No. 2.)[1] The Butlers and the Walkers own property adjacent to the Grandview Dairy, which sits at the edge of a bluff on the Snake River plateau. The Butler spring and the Walker spring are allegedly fed by a shallow aquifer that flows underneath the Dairy before surfacing from the side of the bluff below the Dairy. (See Complaint, ¶ 9.[2])

---

[1] Plaintiff also designated Christopher Hormel of Bliss, Idaho (member since 12/95), as an individual with standing based upon recreational activities in or around the Snake River. Given the undisputed evidence regarding the lack of evidence that the Dairy is polluting the Snake and the undisputed evidence that the Butlers and Walkers deliberately and directly contribute animal waste to any spring water that might discharge from their property into the Snake, Hormel's alleged injury is immaterial.
[2] The Complaint's allegation that the Butler spring is fed by a shallow aquifer can be accepted as

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 2

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

K:\41221\00001\JN\JN__P21KI  2/12/01 2:20 PM

4. The Butlers own and reside at the Spring Cove Ranch, upon which they raise Black Angus cattle. (See Nelson Dec., Ex. 8, Irr. No. 2; Ex. 2, Stacy Butler Dep., pp. 33:18-34:10).) The Butler's alleged "injury" arises from their concern for the water quality of the Butler *spring*, rather than from any concern for the water quality in Clover Creek or the Snake River. (See Nelson Dec., Ex. 3, Dan Butler Dep., pp. 2:17-3:3; Ex. 2, Stacy Butler Dep., pp. 20:7-21:22; 32:21-33:17.) Concern for the spring led the Butlers to oppose the Dairy even before it began operations. (*Id.*, Ex. 2, Stacy Butler Dep., pp. 34:21-36:23 (letter to Bosma); 39:20-41:12 (letter to Senator).)

5. In fact, the Butlers deliberately discharge the manure from their cattle pens directly into the ditch that carries water from the Butler spring across their property, and purposefully allow their cattle to wallow and commit waste in the ditch, the irrigation canal, and the "wetlands" they have created on their property below the spring. (*Id*, Ex. 3, Dan Butler Dep., pp. 11:15-20:21; 21:7-33:17 (the Butlers deliberately discharge wastewater to Clover Creek); 37:4-38:5 (water is polluted by Butler Ranch between outfall from Butler spring and point of possible discharge to Clover Creek); Ex. 6, Monks Dep., p. 119-120 (stream flowed out of spring and across Butler's cattle pens – in fact, Monks had initially recommended that the Butlers should take measures to protect the water quality from this pollution, but Plaintiff's counsel told him to take that out of his written report); 122:8-125:17 (fecal coliform levels were much higher after passing through the Butler's cattle pens in an open ditch than the "non-detect" levels in the spring itself, indicating that the Butlers were polluting the water with animal waste).) The Butlers also allow their cattle to range in and out of water on BLM land. (*Id*, Ex. 3, Dan Butler Dep., p. 36:1-24.) Similarly, the Walkers direct their spring water to an unfenced "stock watering pond" in which their cattle have free range before it drains into a pasture. (Nelson Dec., Ex. 5, Tews Dep., pp. 85:22-86:23.) Thus, the water quality in the drainage from the Butler and Walker springs is significantly more contaminated by animal waste than it is at the springs. (Nelson Dec., Ex. 4, Gay Report, pp. IRCX—00028-30.) In order for the water they have polluted to reach Clover Creek, the Butlers must open a culvert gate and deliberately discharge

---

true for the purpose of this motion. The Butlers have developed their "spring" by installing a 300 foot long 6 inch diameter perforated pipe in pea gravel three feet below grade across the hillside, which they collect into an inverted cistern. (Nelson Dec., Ex. 7, Gay Dep. p. 354:2-14.) For that reason the testimony sometimes refers to the "Butler well."

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 3

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

K:\41221\00001\JNJN_P21KI 2/12/01 2:20 PM

it into the creek. (*Id.*, Ex. 3, Dan Butler Dep., pp. 49:18-53:20 (Butler property did not drain into Clover Creek prior to 1995, when the Butlers modified their property to allow them to discharge to Clover Creek).)

6. The Butlers don't care about alleged pollution in Clover Creek or the Snake River, they only care if their spring is being polluted. (*Id.*, Ex. 3, Dan Butler Dep., p. 39:13-41:9 (Butler only cares about spring water, not pollution of the water below the spring); Ex. 2, Stacy Butler Dep. pp. 42:17-43:20 (Stacy only cares about nitrates in spring, not in the water below the spring); 44:15-24 (not alleging any injury on basis of pollution in water below the spring) 45:5-11 ("my concern is about the spring")[3].)

7. There is no evidence of any surface run-off or discharge of any dairy wastewater from the Grandview Dairy. (Nelson Dec., Ex. 1, James Dep., p. 53:18-21(no evidence of surface water discharge); Ex. 3, Dan Butler Dep., pp. 3:4-11:3 (no evidence or knowledge of any wastewater run-off from the dairy); Ex. 2, Stacy Butler Dep., pp. 28:19-29:23; 51:10-21 (no knowledge of any surface water discharge of water from the Dairy to the Spring Cove Ranch); Ex. 4, Mike Wiggs Dep., pp. 15:11-15; 19:9-17; 25; 30:4-16[4]; Ex. 5, Diana Tews Dep., pp. 31:1-3 (the Dairy has no corrals bordering on another property requiring berming for runoff); 68:19-25 (no evidence of runoff from stockpile area); 81:21-82:24 (saw no evidence of runoff from pile or field into Walker Spring); 87:17-88:16 (berm on North side of property would prevent any runoff to Walker Spring); Ex. 7, Gay Dep., pp. 49:10-22; 54:23-55:2 (Gay saw no evidence of surface water runoff from the Dairy); 131:6-8 (no evidence of runoff from over-spray to farm fields); 75:20-23 (Gay is not worried about a surface water discharge from the Dairy).)

---

[3] In response to IRC's counsel's questions, Ms. Butler testified that she was "concerned" about pollutants from the spring reaching Clover Creek. However, she admitted that she had no factual basis to support that concern. Id., p. 64:20-65;15; 65:22-72:20.

[4] Mr. Wiggs is the dairy program manager for the IDA Bureau of Dairying. (Nelson Dec., Ex. 4, Wiggs Dep. pp. 7:25-8:3.) He has been inspecting Idaho dairies for 13 years. (*Id.*, p. 8:15-17.) He inspected the Grandview dairy on September 21, 1999, following Mrs. Butler's complaint regarding the dairy waste on the Dairy near the Walker spring. (*Id.*, p. 10:7-10). Mr. Wiggs testified that he had never seen any surface water run-off of wastewater from the Dairy. (*Id.*, pp. 15:11-15; 19:9-17; 25; 30:4-16.)

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 4

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

K:\41221\00001\JNJN_P21KJ 2/12/01 2:20 PM

8. There is no admissible evidence of any groundwater pollution traceable to the operation of the Grandview Dairy. To support its allegation of an alleged discharge of pollutants to surface waters of the United States via "seepage of manure wastewater to groundwater hydrologically connected to surface water," as alleged by paragraphs 33 and 34(a) of the Complaint, Plaintiff has produced the opinion testimony of two purported experts, John Monks and Alan Gay. (Nelson Dec., Ex. 9, Plaintiff's Rule 26(a)(2) disclosure.) Neither of these witnesses present evidence sufficient to create a genuine issue of material fact:

*Monks provides no admissible evidence of pollution via groundwater.* Mr. Monks' Rule 26 Report examines the Dairy site and certain published geologic and hydrogeologic information relating to the general vicinity of the site, and concludes that "waste disposal practices at the Dairy have led to additional contamination of the perched aquifer, the Butler Spring and Walker Spring," leading to "*potential* violations of the Clean Water Act." (*Id.*, pp. 15-16 (emphasis supplied); *see also id.*, p. 2 ("*Potential* Violations of the Clean Water Act and the October 1995 agreement between the [Butler's] Ranch and Dairy were observed during the June 15, 2000 site inspection") (emphasis supplied).)[5] His explanation of his methodology and conclusions, however, confirms that he has no *admissible* opinion testimony to offer on the issue:

First, Monks' admitted that he cannot trace or quantify[6] *any* alleged "additional contamination" due to the Dairy operations (as opposed to other acknowledged sources) with any scientific certainty:

    Q. Look at page 10 of your report, please, the second paragraph. You acknowledge that there's several, actually multiple sources of nitrates –
    A. Yes.
    Q. – available in this instance? One is natural organic from precipitation, another is commercial from fertilizers and the third you cite is animal wastes from Dairy operations, do you see that?
    A. Yes.
    Q. But you conclude in the paragraph that you at least can't tell what the source of this nitrogen in the Butler and Walker springs are, is that correct, and you go on to say that it may be necessary to conduct two or more years of quarterly or more frequently monitoring using

---

[5] Monks admits that he has no legal training and is not competent to testify to his opinions regarding alleged violations of the Clean Water Act. (Nelson Dec., Ex. 6, Monks Depo., pp. 15-23.)
[6] *See id.*, p. 118:21-119:3.

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 5

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

K:\4122\\00001\UN\UN__P21KI  2/12/01 2:20 PM

nitrogen isotope analysis before seasonal patterns emerge that would definitely determine the different contributions and the various sources of nitrate; is that correct?

A. That's correct.[7]

Monks also confirmed that he has no admissible opinion testimony to offer regarding alleged "potential" violations of the Clean Water Act.

Q. You are not saying that there have been violations?
A. No.
Q. You are not saying that there will be?
A. No.
Q. No, you are not saying that, or, no, I'm not correct?
A. I am not saying that there will be.
Q. You are just saying that there's a potential?
A. Yes.[8]

Mr. Monks admitted that he did not perform any of the available scientifically acceptable tests to confirm his theory of potential groundwater contamination, (*id.*, 64 – 67; 67:6-7; 68:12-19 (no compaction tests and no permeability tests)), that he did not even check to see if any actual test data was available (*id.* 73:21-74:21), and that he essentially reached his conclusions by "just eyeballing it." (*Id.*, 67:21-25.)

In fact, Monks admitted that his opinion regarding a "potential" violation was based upon the type of methodology he would perform during "Phase 1" of a professional site investigation, in which one looks at existing data in order to form a "*conceptual* model for what is going on.". (*Id.*, 60-61; 61:2-9.) Of course, Monks also admitted that in a *real* scientific site investigation the Phase 1 "conceptual model" is followed by a "Phase 2" study, during which a qualified scientist would "actually go in and do the investigations by drilling more wells, talking more water samples, perhaps doing some geophysics to try to more accurately determine what the conditions in the aquifer are" by getting "site specific data that you have gathered in a rational way" – *i.e.*, "a scientifically responsible manner." (*Id.*, pp. 100:3-101:5.) Monks agreed that actual the Phase 2 investigation work is necessary in order to test the validity of the Phase 1 conceptual models, which are sometimes wrong because hydrogeology is a complex and uncertain science, at best. (*Id.*, pp. 101:7-108:10.)

---

[7] Nelson Dec., Ex. 6, Monks Dep., pp. 45:13-46:9.
[8] *Id.*, pp. 125-126.

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 6

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

K:\41221\00001\JJNJN__P21K1  2/12/01 2:20 PM

Mr. Monks also agreed that it was necessary to do the additional investigations before suggesting that people spend money on groundwater clean-up or remediation projects. (*Id.*, p. 103:3-18.) In fact, Monks admitted that his opinions in this case were *not* based upon a "scientifically responsible" methodology:

> Q. You do that sort of [Phase 2] study when you want to know what the groundwater is doing before you undertake some significant expenditure?
> A. Some significant expenditure that's going to affect the groundwater.
> Q. Because that's the scientifically responsible way of doing it, correct?
> A. Yes.
> Q. And you didn't do that in this case, did you?
> A. We never got beyond phase one, no.[9]

In short, Monks characterized his "methodology" as the "bare bones" of a real scientific methodology, and admitted that his opinions are basically just a "guess." (*Id.*, pp. 106-116; 111:14-17.)[10]

***Gay provides no admissible evidence of pollution via groundwater.*** Mr. Gay purports to have expertise in surface hydrology and the "fate and transport of pollutants as it relates to surface hydrology." (Nelson Dec., Ex. 7, Gay Dep., p. 6:4-16.) Mr. Gay's Rule 26(a)(2)(B) Report indicated that he would testify to an opinion that 3.25 million gallons of Dairy wastewater per year had likely "infiltrated" from the Dairy to groundwater (Nelson Dec., Ex. 9, p. 12 ¶ 34), and that "violations of the Clean Water Act by contamination of the groundwater source for the springs located below the Grandview Dairy have occurred and are likely to recur." (*Id.*, p. 17 ¶ 50). Gay's "infiltration" opinion was based upon work in which he purported to perform a historical "water

---

[9] *Id.*, 104:3-18.
[10] It should be noted that Monks maintained these guesses in the face of actual data to the contrary. For example, Monks' report includes data showing that nitrate levels in the "Butler Spring" exceeded the EPA's "maximum contamination levels" in August and September *1994, before the Dairy even existed.* (Nelson Dec., Ex. 9, p. 9; *see also* Nelson Dec., Ex. 6, Monks Dep., p. 106:16-20 (agreeing that "the Butler Spring had elevated nitrate levels long before the dairy began operations"); Ex. 2, Stacy Butler Dep. pp. 37:9-38:11 (discussing letter accusing previous property owner of polluting well) At deposition, Monks admitted this could indicate that the Dairy was *not* the source of the nitrates in the spring. (*Id.*, Ex. 6, Monks Dep. pp. 82:18-84:12.) Monks' report also admitted that the Idaho State Department of Agriculture's nitrogen "isotope testing results "indicate that the nitrogen in the Bosma lagoon is from human or animal waste, ***the nitrogen in the Butler spring is from commercial fertilizer, and the nitrogen in the Walker spring is from organic sources.***" (Nelson Dec., Ex. 9, p. 10 (emphasis supplied).)

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 7

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

K:\41221\00001\JN\JN__P21XI 2/12/01 2:20 PM

balance" for the Dairy, by determining the difference in the amounts of various "inputs" (total well water usage and storm water runoff) and "outputs" (milk, irrigation, and evaporation) from Dairy's wastewater treatment facilities. After estimating and extrapolating numerous components of these estimated figures, Gay opines that the Dairy generated an extra 3.25 million gallons of wastewater per year between 1997 and 1999 that Gay cannot account for other than by "infiltration to groundwater." (*Id.*, pp. 310:4-311:22.) Gay's opinion testimony does not create a genuine issue of material fact regarding Plaintiff's allegation of groundwater pollution for several reasons.

First, Gay's "opinion" regarding alleged groundwater contamination of the Butler and Walker springs was based upon Monks' report and conclusions, rather than his own work or expertise. (*Id.*, pp. 17-18 (six of Gay's "bullet-point" opinions are "Based on Monks' conclusions"; Nelson Dec., Ex. 7, Gay Dep., pp. 28:19-29:22 (Monks, not Gay, has expertise in groundwater hydrology, Gay relied on Monks in that regard).) As discussed above, Monks' opinions do not present admissible evidence of groundwater contamination in their own right.

As to his *own* alleged opinions, Gay admitted that "I don't know for sure that it [wastewater from the Dairy] did [infiltrate to groundwater]." (*Id.*, pp. 94:5-19; 95:12-15.) Gay also admitted that an appropriate scientific methodology to determine whether the Dairy actually *was* polluting the springs via groundwater infiltration would involve scientifically controlled soil tests and laboratory analysis, waste containment area liner tests and analysis, wastewater sampling and laboratory analysis, and groundwater sampling and analysis, all of which would be needed in order to generate some "hard data" by which to test his hypotheses, none of which has he done. (*Id.*, pp. 59:7-77:3.) Most of these tests were available at the time of his site inspection, at a cost of $30.00 to $50.00. (*Id.*, pp. 68:8-69:1; 74:24-75:8.).)

In fact, Gay admitted at deposition that he simply does not know *what* the source is of any pollutants in the Butler spring, and that he has not employed *any* accepted scientific methodology to determine that question.[11] Gay also admitted that he does not have any way of telling "whether the

---

[11] Nelson Dec., Ex. 7, Gay Dep., pp. 80:18-89:22; 151:11-21; 250:1-18 (no soil content analyses); 260:14-262:6 (soil sample would have been the most scientifically certain method of testing his hypothesis); 330:3-332:5 (soil samples would have been a good and scientifically responsible test of infiltration hypothesis given conflicting data, and were "easy and cheap" at time of inspection); 159:20-15 (Gay conducted no liner tests); 163:11-13 (Gay conducted no soil permeability tests).

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 8

level [of nitrates] in the Butler spring has been influenced by water from the dairy." (*Id.*, p. 99:7-101:22.) Gay admits that "I don't have any data" to back up a groundwater contamination hypothesis. (*Id.* p. 122:5-123:9; *see also* pp. 97:22- 99:6 (Gay was merely speculating as to his opinions regarding groundwater flows); 238:25-239:19 (Gay is unable to determine whether the Butler spring is influenced by the Dairy).)

To summarize Mr. Gay's "opinions" regarding alleged groundwater pollution emanating from the Dairy, he testified as follows:

> Q. Okay. Let me ask you, do you have any hard evidence that would lead you to conclude that the Grandview Dairy is polluting the Butler spring?
> A. No.
> Q. And you don't know and couldn't testify that the Grandview Dairy is polluting the Walker spring either, could you?
> A. No.[12]
>
> ***
>
> A. I believe that -- I want more conclusive evidence than what I have got so far.
> Q. In order to form a scientifically responsible and professionally responsible opinion you need more evidence?
> MR. TEBBUTT: Objection, mischaracterizes his testimony, argumentative.
> A. I wish to have more evidence to base my opinion on.
> Q. (BY MR. NELSON) Especially if you were going to subject somebody, some third-party to potential civil penalties in substantial amount, you would want more evidence in order to feel comfortable enough about your conclusions that you might subject them to that; is that correct?
> MR. TEBBUTT: Objection, argumentative.
> A. I don't wish anybody any harm, I want to have the facts out and in as complete form as I feel I can get.
> Q. (BY MR. NELSON) So you would want more evidence or greater proof before you subjected somebody to that sort of a penalty, right?
> MR. TEBBUTT: Objection, argumentative, calls for facts not in evidence, calls for speculation.
> A. I want more evidence than what I have got here.[13]

Moreover, Gay admitted that even his erstwhile "water balance" opinion was affected by the following flaws:

---

[12] Nelson Dec., Ex. 7, Gay Dep. p. 240:8-16.
[13] Nelson Dec., Ex. 7, Gay Dep. pp. 358:10-359:14; *see also* pp. 403:19-408:25 (in which Plaintiff's counsel tries to rehabilitate the testimony, yet Gay admits that there is "no basis" for his contamination opinion for the years 1997 through 1999.)

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 9

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

K:\41221\00001\UNUN__P21KJ  2/12/01 2:20 PM

- Gays' figures regarding the amount of alleged storm water runoff from the Dairy (one component of the amount of water added "into" the system) were based upon *total monthly average* rainfall figures, rather than the actual available *daily* data. (*Id.*, Ex. 7, Gay Dep., pp. 12:3-13:14.) In an effort to compensate for the skewed results such an assumption would generate, Gay made another assumption which would actually *increase* the alleged amount of "infiltration" his computer program would suggest. (*Id.*, pp. 13:24-17:4.)

- Gay also based his estimate regarding the amount of storm water runoff from the Dairy upon a computer model designed for determining storm water runoff in urban areas that is inappropriate for use during winter months when the ground is frozen, notwithstanding the availability of another, more appropriate model. (*Id.*, pp. 290:3-291:14.)

- Gay's initial reported figure of 3.25 million gallons of "excess wastewater" was more than twice what it should have been, even accepting his other assumptions and calculations. Based upon "new" calculations he allegedly prepared after the first day of his deposition (long after his Rule 26(a)(2)(B) Report was due), Gay revised his "excess wastewater" opinion downward, to a figure of approximately 1.5 million gallons. (*Id.*, 243:9-247:3.)

- Gay began his "water balance" calculations by assuming the occurrence of a 24 hour storm of such magnitude it statistically only occurs once every 25 years, although no such storms occurred during the actual time period. (*Id.*, 337:23-339:4).

- Gay's "margin of error" on the estimated amounts of the "inputs" to his "water balance" were 10% on the storm water runoff (or 435,300 gallons), 10% on well 1 (321,200 gallons) and 20% on well 2 (1.34 million gallons). All told, these possible errors could total 2.1 million gallons, or *30% more than the total amount of the wastewater he could "not otherwise account for,"* even accepting his "outflow" figures as correct. (*Id.*, 315:10-316:18.)

- Once he had estimated that there were 1.5 million gallons of "excess wastewater" he could "not otherwise account for," Gay assumed that the *entire* 1.5 million gallons "infiltrated" into the Butler spring. (*Id.*, p. 320:22-321:4.) The bases of *that* assumption were that (1) "it seemed the logical place to go, (2) he believes he observed "manure solids" in the area of alleged infiltration, which he did not sample, collect, test or photograph to verify; and (3) there are elevated nitrate levels in the Butler spring. (*Id.*, 321:5-18.) However, Gay cannot explain why his assumed "infiltration" would elevate levels of nitrates in the Butler spring, but *not* levels of all the other pollutants scientific theory would suggest would also be elevated. (*Id.*, 321:19-329:13; 347:9-348:11.) Gay has not even considered other available water quality data in this regard. (*Id.*, 33:19-334:13.)

- Gay admitted during deposition that he made errors calculating the size of the Dairy's storage lagoons that accounted for over 500,000 gallons of the 1.5 million he could "not otherwise account for," reducing that figure to "about 1,000,000." (*Id.*, pp. 386:10-391:15.)

- Finally, during deposition Gay admitted to yet *another* 2 million gallon mistake in the quantity of wastewater he assumed was applied in irrigation annually, **which mistake *completely accounted for the "1.5 million gallons" he "could not otherwise account for" during 1997, 1998 and 1999.*** (*Id.*, pp. 369:16-373:10.) Thus, Gay withdrew his opinion of alleged past contamination entirely. (*Id.*)

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 10

9. In September 1999 Stacy Butler called the Idaho Department of Agriculture to complain that a large amount of dairy debris – manure bedding, mastitis tubes, posts, concrete, pieces of metal, and a number of dead cows and calves – had been deposited at the northern boundary of the Dairy, near the top of a draw in which the "Walker Spring" is located. (Nelson Dec., Ex. 3, Stacy Butler Dep. p. 54:6-11; Ex. 5, Tews Dep., 18:14-22; 39:8-25). Although the material had apparently been deposited on the Dairy side of the property line, some of it had slid under the fence, down the hillside into the Walker spring water. (*Id.*, Ex. 5, 39:11-40:2; 83:10-18.) The complaint was responded to by Diana Tews[14] and Mike Wiggs, Diary Inspectors with the Department of Agriculture. (*Id.*, 10:20-23.) They investigated the scene, contacted Jacob Bosma and advised him that the material need to be cleaned-up. (*Id.*, 22:10-17.)

The majority of the material was cleaned up to the Department's satisfaction the next day (*id.*, pp. 47:13-48:17), and the details were resolved within the week. (*Id.*, 57:1-58:1; 84:8-85:9.) The Bosmas were cooperative and responsive in getting the debris cleaned-up and in working to resolve the matter with the Department. (*Id.*, 85:14-21; 88:22-25.) Tews did not see any of the waste materials in the spring water after the clean-up was complete. (*Id.*, p. 56:1-6.)

On September 28, 1999, the Department issued the Grandview Dairy a Notice of Intention to Suspend Dairy Permit, based upon its determination that the Dairy had "caused an unauthorized release of livestock waste beyond the Respondents' dairy farm property boundary." (*Id.*, 25-26; Nelson Ex. 11, p. 3, ¶ 3.7.) The Dairy requested a Settlement Conference as allowed by Idaho law, paid a penalty of $21,098.18, and the matter was resolved to the Department's satisfaction. (*Id.*, 102:22-103:21; Ex. 11 to Nelson Dec., p. 8.)

The Dairy has received "very good" Dairy Waste Inspection scores since September 1999. (*Id.*, 34:34:4-10 (last inspection "very good"); 99:14-20 (October 1999 inspection of waste handling system showed no problems).) Tews and Wiggs inspect nearly 260 dairies in four counties (*Id.*, pp. 4:21-5:5.) Of those 260 dairies, Tews ranks the Grandview Diary "25" or "30" in terms of relative

---

[14] Nelson Dec., Ex. 5, Tews Dep. p. 3:16-25.

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 11

K:\41221\00001\JN\JN__P21KI 2/12/01 2:20 PM

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

1  "cleanliness in general," with "1" being the best. (*Id.*, 34:2-11.)

2  DATED this 12th day of February, 2001.

PRESTON GATES & ELLIS LLP

By _____
Lori A. Terry, WSBA # 22006
John Ray Nelson, pro hac vice
Attorneys for Defendants
Henry Bosma, Grandview Dairy, and Bosma
Enterprises

ARKOOSH & JAMES

By /s/ Tom Arkoosh
C. Tom Arkoosh
Attorneys for Jacob Bosma
Local Counsel for Defendants

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 12

K:\41221\00001\JN\JN__P21KI  2/12/01 2:20 PM

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636

# CERTIFICATE OF SERVICE

I hereby certify that on February 12th, 2001, I caused true and correct copies of DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS to be served to each of the parties listed below in the following manner:

| | | |
|---|---|---|
| Charles M. Tebbutt<br>Marc D. Fink<br>Western Environmental Law Centers<br>1216 Lincoln Center<br>Eugene, OR 97401 | X<br><br>X | U.S. Mail<br>Legal Messenger<br>Facsimile<br>Overnight Delivery<br>Personal Service ☐ |
| Laird J. Lucas<br>P.O. Box 1612<br>Boise, ID 83701 | X<br><br>X | U.S. Mail<br>Legal Messenger<br>Facsimile<br>Overnight Delivery<br>Personal Service |

I declare under penalty of perjury under the law of the State of Washington that the foregoing is true and correct.

EXECUTED at ~~Seattle~~ Spokane, Washington this 12th day of Feb., 2001.

*April Engh*

DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS
COMPELLING SUMMARY
JUDGMENT - 13

K:\1221\00001\JNJN__P21KI  2/12/01 2:20 PM

PRESTON GATES & ELLIS LLP
601 WEST RIVERSIDE AVENUE
SUITE 1400
SPOKANE, WA 99201-0636