Charles M. Tebbutt (OSB #96579)
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: (541) 485-2471

Counsel for Plaintiff

Laird J. Lucas (ISB #4733)
P.O. Box 1612
Boise, Idaho 83701
Tel: (208) 342-7024

Local Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

IDAHO RURAL COUNCIL, an Idaho corporation,

    Plaintiff,

v.

JACOB BOSMA, et al.,

    Defendants.

Civ. No. 99-0581-S-BLW

PLAINTIFF'S TRIAL BRIEF

## INTRODUCTION

This is a citizen suit to enforce the provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1251, et. seq., at defendants' Grandview Dairy, located near Bliss, Idaho. Defendants have discharged and will likely continue to discharge construction debris, manure, wastewater, animal carcasses, and other dairy waste into waters of the United States, in violation of the CWA.

## STATEMENT OF FACTS

Plaintiff Idaho Rural Council ("IRC") is an Idaho nonprofit corporation committed to preserving the economic well-being of Idaho's family farms and rural communities, and to achieving good stewardship of the land, air, and water. Members of IRC include the Butlers, who have lived on the Spring Cove Ranch for over 80 years, the Walkers, who have lived on the Walker Ranch for nearly 30 years, the Voses, who have managed the Walkers' ranch for many

Page 1, PLAINTIFF'S TRIAL BRIEF

years, and Christopher Hormel, who lives in the area and is concerned about pollution from the Grandview Dairy. The Butlers have a spring on their property (hereinafter, the "Butler Spring") which they have used for decades for drinking water, irrigation water, and for their cattle. The Walkers also have a spring (hereinafter, the "Walker Spring") which they use for irrigation and stock watering.

In 1994, Jacob Bosma moved into Spring Cove Road and began setting up a large dairy, known as the Jacob Bosma Dairy, immediately adjacent to and upgradient from the Butler and Walker properties. In 1997, with the addition of Henry Bosma, Jacob Bosma's brother, as financier and partner, the facility changed its name to Grandview Dairy (hereinafter "Bosma" or "Bosmas"). The dairy, which includes approximately 1,500 mature dairy cows[1] and hundreds of heifers, is located entirely on a plateau, approximately 25 to 90 feet above a perched aquifer that surfaces immediately downgradient from the dairy, at the Butler and Walker Springs. Ex. 1005, p.6. Numerous agency documents and documents of Bosma's own consultants indicate that Bosma had ample notice that the dairy was in a sensitive area due the potential for contamination of the down-gradient springs, particularly with respect to area known as the "Faulkner Pond". See, e.g., Exs. 1002, 1004, 1032, 1033. Bosma was using the "Faulkner Pond" area for

---

[1] Each dairy cow produces about 82 pounds of wet manure per day. See CARE v. Henry Bosma Dairy, 65 F.Supp.2d 1129, 1146, n.7 (E.D. Wash. 1999) (citing, Larry C. Frarey and Staci J. Pratt, Environmental Regulation of Livestock Production Operations, 9 Nat. Resources and Env't. 8, 8 (1995)). As summarized in CARE v. Henry Bosma Dairy,
> The enormous amount of animal wastes generated at these industrialized dairies are applied by various methods by dairy owners, operators, or their agents to crop fields which they own or lease. The animal waste is either spread on the fields by trucks or the animal wastewater collected in storage ponds is pumped through a hose to a "wheel line" or a center pivot irrigation line or a powerful "spray gun" and applied to the fields for crop production. If these appliances malfunction or are erroneously operated by the dairy employees, or if the animal wastes are overapplied to the fields for crop production, the animal wastewater may run off the fields, in some cases discharging to waters of the United States.

65 F.Supp.2d at 1147.

Page 2, PLAINTIFF'S TRIAL BRIEF

wastewater storage at least until 1996. Exs. 1032, 1033.

Bosma began dairy operations before obtaining the required approvals. See, e.g., Exs. 1008, 1009, 1011, 1015 (". . . Bosma is thumbing his nose at DEQ and IDWR it [sic] that he has brought cows into the dairy and is milking approximately 300 head."). Bosma has had regular operational and maintenance problems at the facility, including inadequate berming, allowing wastewater to pool in the sensitive "Faulkner Pond" area, allowing cows access to the Northside Canal, spraying polluted water into the Northside Canal, producing excess wastewater, improperly disposing of dead animals and dairy waste, and allowing surface water to run off the property. See, e.g., Exs. 1032, 1040, 1043, 1046, 1047, 1048, 1053, 1058, 1060, 1068, 1069, 1079, 1097. In addition, Bosma has regularly made changes to the facility without the required authorization from state and county officials. See, e.g., Exs. 1061, 1088.

Since 1995, nitrate levels have significantly increased in the Butler and Walker Springs. Exs. 1001, 1114 . Bosma has consistently allowed wastewater to pool in the Faulkner Pond area, adding to pollution in the Butler Spring. See, e.g., Exs. 1032, 1040, 1043, 1058, 1132 (pp. 43-44), 1098. The Butlers have regularly been forced to take excess wastewater from Bosma, outside of their normal growing season, in violation of an agreement between the Bosmas and the Butlers and Bosmas' waste management plan. See Exs. 1035, 1042, 1049, 1052. 1066 (p. 2). Bosma has also frequently allowed surface water and dairy waste to flow into the Walker Spring.

In September, 1999, mounds of waste, estimated to be 50 feet by 50 feet, including manure-soiled bedding, dead dairy animals, fetuses, pharmaceutical waste, construction debris, and feed, were discovered at the source of the Walker Spring. See, e.g., Exs. 1069, 1132. It is not seriously disputed that these animals and waste came from Bosmas' operations. Ex. 6. Some of the waste, including a stillborn calf, was discovered directly in the water. Ex. 1069. In addition to the Walker Spring area, Bosma has also deposited dead animals in the sensitive Faulkner Pond area. Ex. 1053, 1085 . The decomposed appearance of many of the carcasses shows that dumping at the Walker Spring area has gone on for many years. Ex. 1069.

Page 3, PLAINTIFF'S TRIAL BRIEF

IRC sent notice of intent to sue to defendants on October 7, 1999, pursuant to the CWA. Subsequently, Bosmas applied for and obtained a NPDES permit from USEPA. Exs. 5, 1087. The general permit prohibits the discharge of process wastewater to waters of the United States, except in the limited event of a 25-year, 24-hour rainfall event, which has not occurred in this case. Ex. 5 ( pp. 6-7). The discharge of all other pollutants is strictly prohibited. Id.(p. 8). In addition, the permit expressly prohibits the discharge of process wastewater to waters of the United States by means of a hydrological connection. Id. IRC filed suit on December 9, 1999, alleging that Grandview's unpermitted discharges of wastewater and other pollutants into waters of the United States was continuing to occur and was reasonably likely to recur.

Since IRC's complaint was filed, discharges and operational problems at Grandview have continued. Bosmas failed to fully clean up the waste dumped at the Walker Spring even after the complaint was filed. Bosmas have also continued to: dump manure and dairy waste in improper locations; allow runoff into the Faulkner Pond area; overspray the Northside Canal with contaminated irrigation water; have major leaks in an irrigation mainline that potentially allows wastewater to enter the Northside Canal; and produce considerably more wastewater than its facility could properly handle. Exs. 1097, 1098, 1100, 1101.

## ARGUMENT

### A. Statutory Background

Section 301(a) of the CWA establishes that

> Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act [33 U.S.C. §§ 1312, 1316, 1317, 1328, 1342 and 1344], the discharge of any pollutant by any person shall be unlawful.

33 U. S. C. § 1311(a). Thus, the Act prohibits the discharge of all pollutants, except when specifically authorized.

Section 402 of the Act provides for the issuance of pollutant discharge permits under the National Pollutant Discharge Elimination System (NPDES). 33 U.S.C. § 1342. Generally,

Page 4, PLAINTIFF'S TRIAL BRIEF

compliance with a NPDES permit is deemed compliance with Section 301 of the Act, 33 U.S.C. § 1311, and allows pollutant discharges which would otherwise be unlawful. See 33 U.S.C. § 1342(k). Conversely, non-compliance with a NPDES permit or discharges of pollutants without a NPDES permit violate the Act, and automatically subject the violator to civil penalties.[2]

Section 505 of the CWA provides that "[A]ny citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter . . . ." 33 U.S.C. § 1365(a)(1)(A). "Effluent standard or limitation" includes "a permit or condition thereof issued under section 1342 of this title." CWA § 505(f)(6), 33 U.S.C. § 1365(f)(6). Thus, citizens may enforce any violation of effluent limitations, water quality standards, or general permit conditions in a NPDES permit. Northwest Envtl. Advocates v. City of Portland, 56 F.3d 979, 986 (9th Cir. 1995).

The CWA imposes strict liability for NPDES violations. The permit-holder's good faith is not relevant to the issue of liability. See, e.g., Save Our Bays and Beaches v. City and County of Honolulu, 904 F. Supp. 1098, 1105 (D. Hawaii 1994) ("The Act imposes strict liability for NPDES violations. The Act does not allow for 'de minimis' or 'rare' permit violations, and the permit holder's good faith is not relevant to the issue of liability.") (footnote omitted); Citizens for a Better Environment-California v. Union Oil Co. of California, 861 F. Supp. 889, 898 (N.D. Cal. 1994), aff'd, 83 F.3d 1111 (9th Cir. 1996), cert. denied, 519 U.S. 1101 (1997); United States v. Earth Sciences, 559 F.2d 368, 374 (10th Cir. 1979).

**B.  Standard of Review**

The standard to apply in determining whether defendants have violated the CWA is the "more probable than not" standard. This is the standard of proof required in most civil actions,

---

[2] 33 U.S.C. § 1365(d) ("Any person who violates . . . a permit condition or limitation . . . in a permit issued under section 1342 . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation.") (emphasis added). See Leslie Salt Co. v. United States, 55 F.3d 1388, 1397 (9th Cir.), cert. denied 116 S. Ct. 407 (1995) (agreeing with Fourth and Eleventh Circuits that § 1319(d) makes imposition of penalties mandatory when violations are found).

Page 5, PLAINTIFF'S TRIAL BRIEF

and this is a civil action in which plaintiffs seek "civil" penalties under the CWA, 33 U.S.C. § 1365. See Grogan v. Garner, 498 U.S. 279, 286 (1991) ("Because the preponderance-of-the-evidence standard results in roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'") (citations omitted). Plaintiff therefore need only show that it is more likely than not that defendants discharged pollutants into waters of the United States without, or in violation of, a NPDES permit. See United States v. Ward, 448 U.S. 242, 248-50 (1980).

### C. Defendants Have Violated Section 402 of the CWA

To establish a violation of the CWA, plaintiff must prove that (1) defendants are "person[s]," (2) who "discharged" or "added," (3) a "pollutant," (4) from a "point source," (5) into "waters of the United States," (6) and the discharge was not authorized by a NPDES permit. 33 U.S.C. § 1311(a); see 33 U.S.C. § 1342; Comm. to Save Mokelumne River v. East Bay Util. Dist., 13 F.3d 305, 308 (9th Cir. 1993); CARE v. Henry Bosma Dairy, 65 F.Supp.2d at 1155.

#### 1. Defendants are "Persons" for the Purposes of the CWA

The CWA defines "person" to include an "individual," a "corporation," or a "partnership." 33 U.S.C. § 1362(5). Defendants indisputably constitute "persons" for the purposes of the Act. Jacob Bosma, Henry Bosma, and the companies set up by Henry Bosma for purposes of the dairy operations are all "persons" who are strictly liable for the Clean Water Act violations.

#### 2. Defendants Have Discharged and Are Likely to Continue to Discharge Manure, Dead Animals, and Other Dairy Waste to Waters of the United States

The CWA defines the terms "discharge of a pollutant" and "discharge of pollutants" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. §§ 1362(12)(A). Defendants have illegally added manure, manure wastewater, dead dairy animals, other dairy waste, and construction waste to waters of the United States on numerous occasions.

    a) <u>Discharges to the Walker Spring</u>

Page 6, PLAINTIFF'S TRIAL BRIEF

The source of the Walker Spring is located near the south border of the Walker property, immediately downgradient from the Grandview Dairy. The Dairy sits on a plateau that drains down into the Walker Spring draw. From 1995 through September, 1999, Michael Vos, the manager of the Walker Ranch, regularly observed surface waste runoff from the Grandview Dairy make its way onto the Walker property, down into the draw of the Walker Spring.[3] Approximately once a month during the summer, from 1995 through 1999, Bosmas would improperly run their irrigation system, which would result in runoff down into the Walker Spring ravine. In general, the irrigation water at Grandview often contains manure. In addition, waste from the hospital barn has been observed running onto the ground by Mr. Vos, and Bosmas' waste management plan states the manure water is used for pivot irrigation and that manure solids are applied to fields. Exs. 1029 (pp. 3-4), 1096 (p. 5).

In the winter of 1998-99, Bosmas converted the calving barn on the north side of their property into a hospital barn. Prior to the construction of new waste pits in the fall of 1999 and summer of 2000 [4], Bosmas discharged dairy waste from the hospital barn directly onto open ground between the barn and the Walker Spring. Testimony of Mike Vos. The dairy waste, including animal viscera, mastitis tubes and other pharmaceutical waste, subsequently began to appear in and around the Walker Spring. Id. These regular events culminated in mid-June, 1999, when Bosmas left sprinklers running for three days that were directed onto the open ground. Id. Mr. Vos witnessed the steady flow of wastewater flowing onto the Walker property, and into the Walker Spring.[5] Id. The wastewater included manure, syringes, examining gloves, and mastitis

---

[3] By virtue of an easement, Mr. Vos visits the Grandview Dairy almost every day to open or shut the headgate on the Northside Canal.

[4] The waste is still applied to open ground that has been reconfigured to contain the waste in unlined holding pits.

[5] On June 20, 1999, Mr. Vos spoke to Jacob Bosma about the runoff and asked him to do something, but the flow continued throughout the day.

Page 7, PLAINTIFF'S TRIAL BRIEF

tubes. During this time, Mr. Vos further observed that the same area had received surface water runoff in the past, which would have also ended up in the Walker Spring. Id.

A few months later, on September 18, 1999, numerous dead animals and a large amount of dairy waste were discovered at the source of the Walker Spring. Exs. 1068-1080. Mike Wiggs of IDA inspected the area on September 19, and found many dairy carcasses, including a stillborn calf that was lying directly in the water below the outlet of the spring. Ex. 1069. According to Mr. Wiggs, "it appears the calves were being brought out to this sight and dumped over the edge of the draw which this spring is in and were left to rot away. There were old decayed carcasses of bone and hides and several fresh calves that appeared to be dumped recently." Id.

Marv Patten and Diane Tews of IDA inspected the Walker Spring area on September 23, 1999. The waste included manure-soiled bedding, construction scraps (iron, concrete, wood), barrels, miscellaneous milk barn trash (mastitis tubes, syringes, paper towels, milking gloves), dead animals, skin, hair. See Ex.1132 (pp. 38-39). Ms. Tews observed dead animals, straw, and pharmaceutical waste directly in the water of the spring. Id. (pp. 39-40). The waste pile was estimated to be 50 feet by 50 feet, 4-5 feet deep, and extend 200-400 feet down Walker Spring.

The large volume, wide variety, and age of materials that were dumped indicate that defendants routinely dumped waste into, and immediately above, the Walker Spring ravine. Jacob Bosma admits that the site was used for disposal for years. Ex. 1134 ( p. 233:14-22).[6] The site was also not promptly or properly cleaned up, as waste continued to be observed in the area even after plaintiff's complaint was filed. Mike Vos observed that the area was still littered with manure and other dairy waste the weekend after Thanksgiving 1999, and informed Henry Bosma

---

[6] The evidence indicates that the dumpings were intentional. In a telephone call between Marv Patten and Jacob Bosma, Bosma stated that "he wouldn't have dumped animals there if he knew the spring was there." Ex. 1075. Mr. Bosma, plaintiff will prove, did indeed know that the spring was there.

Page 8, PLAINTIFF'S TRIAL BRIEF

on December 29, 1999 that the area had never been fully cleaned up. Art and Dan Butler also observed dairy waste in the Walker Spring in October, 1999, and again on February 3, 2000.

Bosmas continue to allow waste and wastewater to pool in unlined settling basins near the hospital barn, immediately upgradient from the Walker Spring. IRC's experts will testify that when manure-contaminated wastewater is stored in these unlined basins, the waste infiltrates to the perched aquifer, which flows downgradient to the Walker Spring. The Walkers remain concerned about the hydrological connection between these unlined basins and their spring, as the nitrate levels in their spring have steadily increased and been consistently higher than any other tested point in the area. Defendants' expert acknowledges that these unlined basins leak, but defendants have not calculated the leakage rates. Ex. 1133 (pp. 79:11-25, 80:1-21).

b) Discharges to the Butler Spring

The Butler Spring is bordered by Grandview Dairy to the east, and is located immediately downgradient from the Dairy. An area commonly known as the "Faulkner pond area" is located on the western edge of the Dairy, approximately 550 feet upgradient from the Butler Spring. Ex. 1136. Bosma has been aware since it began operations that wastewater should not be allowed to enter the Faulkner pond area due to threats to the Butler Spring. See, e.g., Exs 1002, 1004, 10032, 1034. According to Michael McMasters of the Idaho Department of Environmental Quality (DEQ), the prior owner of the Bosma's property had deepened the Faulkner pond area, breaking the natural hardpan seal, so that any waste in the pond would seep into the ground and contaminate the spring. See Ex. 1141 (Jake Bosma v. Robert Lupton, Civ. No. 96-0257-S-BLW (D. Id. Oct. 14, 1997) (Memorandum Decision and Order, p. 4)).[7]

---

[7] Steve Thompson, District Conservationist with the Soil Conservation Service, reviewed soil sample test results in 1994 and concluded that the soil was so permeable that the stored waste could seep downward and contaminate the ground water. Jake Bosma v. Robert Lupton, Civ. No. 96-0257-S-BLW (Oct. 14, 1997, Memorandum Decision and Order, p. 4); see also, id, p. 8 ("In this case, DEQ certainly had information indicating that if Bosma stored waste in the old pond, he might contaminate the Butler's spring.").

Page 9, PLAINTIFF'S TRIAL BRIEF

Bosmas have regularly allowed water to pool in the Faulkner Pond area, despite the early warnings about the connection to the Butler Spring. Bosma, in fact, used the area for waste storage from the early days of his operation and continues to do so. See, e.g., Exs. 1032, 1040, 1043, 1058, 1132 (pp. 43-44), 1098. On July 31, 1998, the Butlers again photographed wastewater runoff in the Faulkner Pond area. The Butlers next observed wastewater flowing towards the Faulkner Pond area on February 10, 1999. Ex. 1058. During a June 24, 1999, IDA Inspection, water was again observed pooled in this area. Water was also shown impounded in the Faulkner pond area in a July, 1999 aerial photograph. Ex. 1056. IDA inspectors again observed water in the Faulkner Pond on September 23, 1999. . According to inspector Tews, the water was "dark". Ex. 1132 ( p. 45). Runoff was observed flowing down into the Faulkner Pond area in late June, 2000. Ex. 1098. The early concerns of Idaho's state agencies have proven to be valid, as wastewater has infiltrated into the perched aquifer when stored in the unlined Faulkner Pond area.

Bosmas have also deposited dead dairy animals in the Faulkner Pond area. On May 6, 1998, Al Schrader of the South Central District Health Department observed calf remains sticking out of the ground and in a small pond of water that had pooled in this area. Ex. 1085, 1131 (p.12);[8] see also Ex.1053. A dead farm animal was again discovered in the Faulkner pond area on February 10, 1999. Ex. 1057. Cow bones and manure were also observed in the Faulkner pond area by plaintiff's experts at the June 15, 2000, site inspection.

The Faulkner Pond area is hydrologically connected to the Butler Spring, as the volume of water in the Spring increases whenever water is allowed to pool in the pond area. Exs. 1005 (p. 7), 1055. Test results indicate that when the Faulkner Pond area is used by Bosmas as storage

---

[8] Mr. Schrader considered the dead animals in this area to be a health concern due to their location uphill of the Butler Spring. Ex. 1131 (p. 13). Mr. Schrader returned a few weeks after his initial visit and observed skeletons and hides that still remained in the Faulkner Pond area. Id.

Page 10, PLAINTIFF'S TRIAL BRIEF

for its wastewater, nitrate levels in the Butler Spring increase. Ex.1110 (p. 15) ("Nitrate levels at the Butler Spring rose significantly during the summer of 1999, when the Faulkner pond was used for waste disposal, then returned to lower levels in June, 2000). Bosmas' NPDES permit expressly prohibits discharges to hydrologically connected groundwater. Ex. 5 ( p. 8).

In addition to the Faulkner Pond area, Bosmas have also regularly allowed wastewater to be stored in other unlined areas, thereby contributing additional wastewater to the perched aquifer, which flows downgradient to the Butler and Walker Springs. Ex 1110 (p.15). The Butlers have witnessed and photographed liquid storage in areas near the separator continuously since the Dairy began operation. At the time of the June 16, 2000, site inspection, Grandview had recently constructed new "chiller" water ponds which contained manure water. During the June 15, 2000, inspection, the spillway leading to unlined evaporation ponds north of the new hospital barn also contained foul smelling liquid, syringes, animal viscera and a high concentration of flies. Ex. 1110 (pp. 13, 32-33).

Bosmas' wastewater has been discharged into the Butler Spring as the result of the direct hydrological connection. Before Bosma began operation, nitrate levels in the Butler Spring were around or below the EPA safety threshold for human consumption of 10 mg/liter (parts per million or ppm). Ex. 1118. In July, 1999, the Butler Spring was sampled by the Idaho Department of Environmental Quality (DEQ) and found to have a nitrate level at 18.5 mg/liter. Id. A groundwater study that was started by the Idaho Department of Agriculture (IDA) in 1999 determined that nitrate levels are present at most sample points in the area, with the highest values occurring at the Butler and Walker Springs. Ex. 1110 ( p.10). The nitrate levels in the Butler Springs remain at levels higher than sites upgradient from the Grandview Dairy.[9]

    c) <u>Discharges to the Northside Canal</u>

---

[9] Test results have been conducted to try to identify the source of nitrogen contamination, but results at this time indicate multiple sources.

Page 11, PLAINTIFF'S TRIAL BRIEF

In late June, 2000, Art Butler observed and photographed Grandview Dairy's big pivot directly overspraying the Northside Canal on the south side of the Dairy. Ex. 1097. The irrigation water that Bosmas apply through their pivots often contain manure, especially since October, 1999, when the Butlers notified Bosmas that they would no longer accept the Dairy's excess wastewater. Ex. 1096. Art Butler has also personally observed wastewater in the pivots at times when irrigation water is not available from the canal.[10]

For several years, Bosmas have had leaks in an irrigation mainline serving its north pivot, and runoff has been observed flowing from these leaks into the Northside Canal. There is potential for these leaks to allow additional wastewater to enter the Northside Canal every time Bosmas apply lagoon wastewater to the north pivot. This potential was realized most recently in April 2001, when a ditch rider from the Northside Canal Company observed a broken irrigation line discharging into the Northside Canal. Ex. 1101. It took Bosmas several days to repair this line.

The southwest edge of Bosmas' north pivot is irrigated land that is too rocky to farm. This pivot is on a plateau, and when water is applied, runoff can easily run down the ravine and into the canal. The leaks in the mainline, along with this runoff on the southwest edge, have saturated the ground so much in the past that they created a small landslide.

### 3. Manure, Dead Animals, and Dairy Waste Are "Pollutants" under the CWA

Under the Clean Water Act, a "pollutant" is defined to include any solid waste, sewage, garbage, sewage sludge, biological materials, and agricultural waste. 33 U.S.C. § 1362(6). Solid manure as well as manure runoff and leachate constitute pollutants under this definition. CARE v. Bosma, 65 F.Supp.2d at 1155 (wastewater and manure are pollutants); Concerned Area Residents for the Env't v. Southview Farm, 34 F.3d 114, 117 (2nd Cir. 1994), cert. denied, 115

---

[10] For further evidence that wastewater is applied through Bosmas' irrigation system, see also the June 24, 1999, IDA inspection report, which documents wastewater being applied to a field west of the cowyards through sprinkler hand lines. Ex. 1060.

Page 12, PLAINTIFF'S TRIAL BRIEF

S. Ct. 1973 (1995) (manure from CAFO discharged into water considered pollutant under CWA). The other types of waste the Grandview dumped into the Walker Spring, including straw, feed, carcasses, and pharmaceutical waste, also fit within this definition.

### 4. Grandview Dairy is a "Point Source" under the CWA

A "point source" is "any discernible, confined and discrete conveyance including but not limited to any pipe, ditch, channel, tunnel, conduit, . . . <u>concentrated animal feeding operation</u>, or vessel . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added). Bosmas do not dispute that Grandview is a CAFO.[11]

In <u>CARE v. Sid Koopman Dairy</u>, 54 F.Supp.2d 976 (E.D. Wash. 1999), the court found that the Clean Water Act does not

> relieve CAFO farmers from responsibility for over applications and misapplications of CAFO animal wastes to fields in amounts or locations which will then discharge into the waters of the United States. The instruments or machinery used to apply those animal wastes will be considered "point sources" under the CWA. For example, trucks filled with animal wastes at the animal confinement area which apply those animal wastes to crop production fields in mounds close to the "waters of the United States" would be considered "point sources" and discharges to the waters of the United States from those mounds due to that misapplication would be discharge violations subject to the CWA. Enforcement of the CWA does not stop at the edge of the animal confinement area.

<u>Id.</u> at 981. Under the foregoing analysis, the "instruments or machinery" used by defendants to deposit dead animals, dairy waste, and manure directly in or immediately upgradient from the Walker Spring are point sources under the CWA, and discharges from the piles of waste into the Walker Spring are CWA violations. The pipe from the hospital barn which discharged waste onto the open field, which ran down into the Walker Spring, is also a point source. And, the

---

[11] An "animal feeding operation" is a CAFO under the CWA if it confines more than 700 mature dairy cattle or 1,000 animal units. 40 C.F.R. § 122.23(b)(3), 40 C.F.R. Pt. 122, App. B. Grandview Dairy confines approximately 1,500 mature dairy cows and hundreds of heifers.

Page 13, PLAINTIFF'S TRIAL BRIEF

Faulkner Pond area, along with the other unlined basins where Bosmas have improperly stored wastewater, are part of the CAFO disposal system, and therefore also point sources.[12]

### 5. The Walker Spring, the Butler Spring, and the Northside Canal are "Waters of the United States" under the CWA

The CWA prohibits discharges of pollutants from point sources to "waters of the United States." 33 U.S.C. § 1311(a) (prohibiting the discharge of any pollutant); 33 U.S.C. § 1362(12) (defining discharge of a pollutant as any addition of any pollutant to navigable waters from any point source"); 33 U.S.C. § 1362(7) (defining "navigable waters" as "waters of the United States").

This Court has already established as the law of the case that both Butler and Walker Springs are "sufficiently connected through surface waters to Clover Creek as to fall within the definition of waters of the United States." 143 F. Supp. 2d 1169, 1178-1179. While this Court did not expressly hold that the Northside Canal is a water of the United States, it indicated as such when it held that Walker Spring is a water of the United States due to its connection, via the Northside Canal, to Clover Creek. Id. ("Walker Spring runs into a pond, across a pasture and then into the Northside Canal, which runs into Clover Creek at some point downstream."). Since the Northside Canal flows into Clover Creek, Northside Canal itself is a water of the United States. Id.; see also Headwaters v. Talent Irrigation Dist., 243 F.3d 526, 533-34 (9th Cir. 2001) ("A 'stream which contributes its flow to a larger stream or other body of water' is a tributary.").

### 6. Bosmas' Discharges to the Butler and Walker Springs Via Hydrologically-Connected Groundwater Are Also Subject to the CWA

This Court has also held that the CWA "extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States." 1143 F. Supp. 2d at 1180. Pursuant to the Court's decision, Plaintiff must prove that

---

[12] Containment ponds are also considered point sources. See Washington Wilderness Coalition v. Hecla Mining Co., 870 F.Supp. 983, 988-89 (W.D. Wash. 1994), dismissed on other grounds, per unpublished decision (E.D. Wash. May 7, 1997).

Page 14, PLAINTIFF'S TRIAL BRIEF

pollutants from the dairy reached Butler and Walker Springs through the groundwater underlying the dairy. Id. IRC will present evidence at trial, including eyewitness testimony, numerous agency documents, and expert testimony, proving that, more likely than not, Bosmas' discharges of pollutants to groundwater have resulted in contamination of Butler and Walker Springs.

### 7. Defendants' Discharges Are Not Authorized By Law

Neither the CWA nor Bosmas' NPDES permit authorize discharges of manure waste to waters of the United States. Defendants' NPDES permit prohibits the discharge of any animal manure wastes except where such discharge is due to or a direct result of a "25-year, 24-hour rainfall event for that location." Exhibit 5. None of the violations that plaintiff has identified meet this narrow exception.[13]

## D. Bosmas' Illegal Discharges are Continuing or Reasonably Likely to Continue

As the Ninth Circuit has recognized, to prevail at trial a citizen-plaintiff in a Clean Water Act case must prove ongoing violations have occurred, which may be proven either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Natural Resources Defense Council v. Southwest Marine, Inc, 236 F.3d 985, 988 (9th Cir. 2000) citing Sierra Club v. Union Oil Co., 853 F.2d 667, 671 (9th Cir. 1988). The Ninth Circuit "has adopted the Fourth Circuit's conclusion that '[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.'" Southwest Marine, 236 F.3d at 988 (emphasis in Ninth Circuit opinion), quoting Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 172 (4th Cir.1988). "[T]he proper point from which to assess the likelihood of continuing violations is not the present, with its advantage of hindsight, but the time of the original suit."

---

[13] Further, all discharges prior to November 8, 1999, the date Bosmas became covered by the Idaho general NPDES permit for CAFOs, violated section 301(a) of the CWA. 33 U.S.C. § 1311(a).

Page 15, PLAINTIFF'S TRIAL BRIEF

Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 693 (4th Cir. 1989); see also Sierra Club v. Union Oil Co., 853 F.2d at 671.

In the present case, violations continued after December 9, 1999, when the complaint was filed. As stated above, in June, 2000, Art Butler observed Bosmas' big pivot overspraying the Northside Canal. Ex. 1097. The photographs show the irrigation sprinkler system, which often contains manure, spraying directly over the canal. Id. In June, 2000, Mr. Butler also observed irrigation runoff from Grandview running into the Faulkner Pond area, which is hydrologically connected to the Butler Spring. Ex. 1098. Bosmas also failed to properly clean up past discharges of dairy waste to the Walker Spring until after plaintiff's complaint was filed. Dan and Art Butler visited the site on February 3, 2000, and observed pharmaceutical waste still present. Mike Vos also continued to observe manure, straw, and dairy waste at the spring area.

In addition, there was, at the time the complaint was filed, and there continues to be, a likelihood of a recurrence of intermittent or sporadic discharges from Grandview to waters of the United States. Bosmas have a long history of operational and maintenance problems at Grandview that have led to numerous past discharges of pollutants, and that will likely lead to future discharges. See, e.g., Exs. 1032, 1040, 1043, 1046, 1047, 1048, 1053, 1058, 1060, 1068, 1069, 1079, 1097. Inspection reports from the IDA indicate that improper berming and containment of wastewater has consistently been a problem at the facility. Exs. 1040, 1046, 1047, 1060. The facility has regularly deposited dead animals, manure, and dairy waste in improper locations. And the facility has allowed its animals to have direct access to the canals that run through the property, as well as the Walker Spring. Exs. 1079, 1132 (p. 66) ("And the cows had access to that when they went to the pasture."), 1099. The IDA found some evidence that cows had in fact been down in the canal. Bosmas' cows also still graze in the Faulkner Pond area, a point source of wastewater collection. See Ex. 1134 (p. 215).

Evidence obtained by IRC since the filing of its complaint indicates that the operational and maintenance problems at Grandview are continuing, leading to expected additional

Page 16, PLAINTIFF'S TRIAL BRIEF

discharges to surface waters. On March 2 and March 10, 2001, Mr. Butler photographed multiple piles of manure, bedding, and debris on Grandview's east property line, approximately 50-75 yards from the canal, with no evidence of any berming or containment. Ex. 1100. Bosmas, therefore, continue to dispose of its waste in unapproved and improper locations, and rain events could easily result in additional pollutants reaching the canal, in violation of the CWA. The Butlers also continue to observe large leaks in the pipeline serving Bosmas' north pivot. Because of the leaks, every time Bosmas apply wastewater to the north pivot, there is potential for wastewater to enter the Northside Canal. Moreover, a ditch rider from the Northside Canal Company observed a broken pipe discharging water into the Northside Canal in April 2001. Ex. 1101.

Bosmas have also regularly generated more wastewater than their waste lagoon were designed to hold. See Exs. 1042, 1052, 1083. Pursuant to their NPDES permit, Bosmas are required to hold (1) process wastewater plus (2) all contaminated runoff from a 25-year, 24-hour rainfall event, plus (3) three inches of runoff from the accumulation of winter precipitation or the amount of runoff from the accumulation of precipitation from a one in five year winter. At the time plaintiff filed the complaint, however, the facility was inadequately designed and constructed to handle all wastes and runoff from a 25-year, 24-hour storm event. For example, defendants' lagoon has filled in less than 90 days without any 25-year/24-hour event or a complete one in five year winter. See Ex. 1049 ( letter from Dan Butler to Jake Bosma (empty lagoon)), Ex. 1052 ( letter fromShull to Dan Butler (lagoon is full)). In order to try to protect their spring, the Butlers have in the past been forced to apply Bosmas' excess wastewater to some of their frozen fields and their irrigation pond, which resulted in crop failures and a major fish kill. Now that the agreement between the neighbors concerning the excess wastewater has been rescinded for cause by the Butlers, there is a high probability that Bosmas lack adequate storage capacity. At the very least, Bosmas did not have adequate capacity during the winter of 1999-2000, after IRC filed its complaint.

Page 17, PLAINTIFF'S TRIAL BRIEF

Further, Jacob and Henry Bosmas' long-standing disregard for environmental laws, including the CWA, makes it evident that violations will likely continue. From the dairy's inception, defendants' have failed to comply with rules and requirements for operation. Indeed, Jake Bosma sued the State of Idaho for requiring his facility to comply with Idaho's dairy waste management laws. See Jake Bosma v. Robert Lupton, Civ. No. 96-257-S-BLW (D.Idaho 1997). Bosma knowingly began milking cows without necessary approvals. See, e.g., Exs. 1008, 1009, 1011, 1015. The Dairy has failed to comply with its "best management practices." Ex. 1065 ("[Bosma] agreed to apply BMPs and has failed to do so . . . "). Bosmas have regularly expanded prior to obtaining necessary approval. See, e.g., Exs. 1061, 1088. In addition, Jacob Bosma informed his neighbor Mike Vos that he was not going to do anything to improve his wastewater problems unless government agencies forced him to do so. With respect to a water use matter, Bosma told another neighbor he would rather "pay the fines and go on" than comply in advance. Ex. 1019. Finally, Henry Bosma, a partner in Grandview, was recently fined $171,500.00 for CWA violations at his main dairy facility in the state of Washington. CARE v. Bosma, 98-3011-EFS (E.D. Wash. 2001). These events show that defendants' disregard for the law will likely lead to violations in the future.[14]

E. **Plaintiff's Claims Are Not Moot**

"A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." Friends of the Earth v. Laidlaw, 528 U.S. 167, 170 (2000) (citation omitted). The Supreme Court has implied that even the retention of a valid NPDES permit may be sufficient to defeat a mootness claim. Laidlaw, 528 U.S. at 193-194. For the same reasons

---

[14] Bosmas' attitude and history negate their anticipated defense that they "won't do it again". Such "protestations of repentance and reform" are insufficient to moot IRC's claims. See Gwaltney of Smithfield v. Chesapeake Bay Fdn., 484 U.S. 49, 67 (1987).

Page 18, PLAINTIFF'S TRIAL BRIEF

discussed in the previous section regarding the continuing likelihood of section 402 violations, and the continuing nature of defendants' 404 violations, defendants cannot meet the heavy burden placed upon them in proving mootness.

### F. Henry Bosma and Jacob Bosma are Individually Liable

IRC anticipates that Henry Bosma will seek to shield himself from individual liability. However, IRC intends to prove that Henry Bosma is an owner and/or operator of the dairy subject to individual liability. Should this issue be contested, the law allows for the piercing of a limited liability company shield. The two core elements in piercing the corporate veil, that are also considered in piercing the veil of an LLC are: 1) whether there is such a unity of interest and ownership that the separate personalities of a corporation and the individual no longer exit; and 2) whether recognition of the corporate form would sanction a fraud, promote injustice, or result in inequity. See Van Dorn Co. v. Future Chem. & Oil Corp., 753 F.2d 565, 569-570 (7th Cir. 1985).

More recently, courts have ruled that the LLC veil could be pierced under similar grounds and that the determination of whether veil piercing is appropriate is a "fact specific" inquiry, requiring the examination of factors including: 1) disregard of corporate formalities; 2) inadequate capitalization; 3) intermingling of funds; 4) overlap in ownership, officers, directors and personnel; 5) common office space, address and telephone numbers of corporate entities; 6) the degree of discretion shown by the allegedly dominated corporation; 7) whether the dealings between the entities are at arms length; 8) whether the corporations are treated as independent profit centers; 9) payment of guarantee of the corporation's debts by the dominating entity, and 10) intermingling of property between the entities. See MAG Potfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58 (2nd Cir. 2001), citing Freeman v. Complex Computing Co., 119 F.3d 1044, 1053 (3d Cir. 1997). Due to space limitations this issue will be further briefed only if necessary.

Page 19, PLAINTIFF'S TRIAL BRIEF

## G. Declaratory Relief is Appropriate

IRC seeks a declaration that the Bosmas, individually and as owners and operators of the shell companies created to run the facilities, have violated and continue to violate the CWA, and their NPDES general permit. Such relief is appropriate due to the bifurcated nature of this proceeding. The propriety of injunctive and remedial relief, penalties, and attorneys and expert fees and costs will be decided during the penalty phase of this trial.

## H. Plaintiff's Objections to Defendants' Trial Submissions

Pursuant to Local Rule 16.3(b), plaintiff reserves the right to object to defendants' trial submissions. Plaintiff's objections will be set forth in plaintiff's response to defendants' trial memorandum.

## CONCLUSION

For the foregoing reasons, IRC requests that the Court declare that defendants have violated the Clean Water Act by discharging manure wastewater, dead animals, and other dairy waste into the Walker and Butler Springs, and the Northside Canal, in violation of the CWA and their NPDES permit on the specific occasions to be proven at trial. Defendants' section 402 violations have continued after IRC's complaint was filed, and are reasonably likely to recur.

Respectfully submitted this 15th day of November, 2001,

Charles M. Tebbutt
Counsel for Plaintiff

Laird Lucas
Local Counsel for Plaintiff